## State of Vermont v. Donna Robillard

[508 A.2d 709]

No. 83-649

Present: **Allen, C.J., Hill, Peck, Gibson and Hayes, JJ.**

Opinion Filed February 28, 1986

624

*Shelley A. Hill,* Windsor County Deputy State's Attorney, White River Junction, for Plaintiff-Appellee.

*Bruce M. Lawlor* and *Deborah S. McCoy,* Springfield, for Defendant-Appellant.

**Peck, J.** Defendant Donna Robillard appeals her conviction of operating a motor vehicle while she was under the influence of intoxicating liquor. 23 V.S.A. § 1201(a)(2). The alleged offense occurred early in the morning of July 30, 1983, in the town of Springfield, Vermont. Trial was by jury with a verdict of guilty. Post-trial motions were heard and denied; judgment was entered on the verdict. We remand for further proceedings.

Defendant's appeal asks this Court to review two issues. First, she contends the court below erred in denying her motion, couched in the alternative, for a judgment of acquittal, V.R.Cr.P. 29, or for a new trial, V.R.Cr.P. 33.* The motion was based on the ground of newly discovered evidence resulting from recanted testimony by one of the State's witnesses. Second, defendant argues that she was denied her right to a fair trial because the judge ordered the courtroom doors locked during the actual trial proceedings. However, the doors were open for public access before the commencement of proceedings and during recess periods.

■ The evidence was conflicting, particularly on the question of whether defendant had consumed sufficient liquor, before operating her car, to place her under the influence. Nevertheless, in reviewing the sufficiency of the evidence to sustain a conviction, we will view the evidence in the light most favorable to the State, and exclude the effect of any modifying evidence. *State* v. *Nash*, 144 Vt. 427, 433, 479 A.2d 757, 761 (1984).

Considering the evidence in the context of the standard recited above, the facts as presented at trial may be summarized as follows. State's witness William H. Garrow, III, who described himself as a former boyfriend of the defendant, and who was living with her on the date of the offense, testified that he arrived at a Springfield bar sometime between eight and nine o'clock in the evening of July 29, 1983. According to Garrow, defendant was already in the bar when he arrived. They did not sit together during the course of the evening, but he bought and sent to her table "four or five drinks." There was no direct evidence that defendant consumed any of these drinks; she denied drinking any of them and testified that she just left them on her table. It was not disputed that she did have one drink furnished by another friend.

Although they were not in each other's immediate company while in the bar, Garrow and the defendant left together around midnight in the latter's car; defendant was driving. An argument broke out between the two almost immediately. Still within sight of the bar, Garrow opened the car door and either jumped or fell out. As a result, he was rendered unconscious, although he was

---

* It is permissible to combine motions for judgment of acquittal and for a new trial, provided that, if the motion is granted on the ground of insufficiency of the evidence, an acquittal must be entered as a protection against double jeopardy. *Burks* v. *United States*, 437 U.S. 1, 18 (1978).

not seriously injured. Defendant immediately stopped her car and ran back to look after her friend.

Shortly after the accident, an officer of the Springfield police department arrived at the scene and an ambulance was summoned. Garrow was taken to the hospital and defendant was permitted to accompany him in the ambulance. The officer talked briefly with defendant at the scene and noted the odor of liquor on her breath. He talked with her again at the hospital, and noticed that she swayed as she walked, and again he detected the odor of liquor on her breath. The officer maintained he asked defendant twice whether she had taken anything to drink since the accident; she responded twice that she had not. The officer then arrested defendant and took her to the police station for processing. Breath testing disclosed a blood-alcohol level of .209%, and relation-back testimony at trial estimated a level of .13% at the time of operation.

The defense evidence tended to show that she had taken no more than one drink in the bar, and that a friend who was with her at the hospital gave her more to drink there from a bottle and a flask that the friend happened to have in his car. However, another witness testified that he had not seen defendant drinking at the hospital. Defendant denied that she told the officer she had nothing to drink since the accident.

## I.

### A.

The sole issue raised by a motion for acquittal under V.R.Cr.P. 29 is "whether the prosecution has introduced evidence fairly and reasonably tending to show the defendant's guilt, that is, whether the jury on that evidence would be justified in finding guilt beyond a reasonable doubt." *State* v. *Poirier*, 142 Vt. 595, 599, 458 A.2d 1109, 1111 (1983) (citation omitted); *State* v. *Menard*, 142 Vt. 47, 49, 451 A.2d 1100, 1101 (1982) (the standard of proof in criminal cases is guilt beyond a reasonable doubt). We reiterate that, on appeal, we will view the evidence in the light most favorable to the State, excluding the effect of modifying evidence. *State* v. *Nash, supra,* 144 Vt. at 433, 479 A.2d at 761. Furthermore, the credibility of the witnesses and the relative weight to be given their testimony are matters for the jury, as the trier of the facts, to determine. *Claude G.' Dern Electric, Inc.* v. *Bern-*

*stein*, 144 Vt. 423, 426, 479 A.2d 136, 138 (1984). Applying the above standards to the evidence as summarized above, we hold the jury was justified in finding the defendant guilty beyond a reasonable doubt. The motion for a judgment of acquittal was properly denied.

## B.

During the course of his testimony at trial, the State's witness Garrow stated under oath that he had several discussions with defendant since the night of the accident and that defendant told him of a scheme to escape conviction: she and others would testify that she had not been present in the bar that night, but went there only in response to a phone call from him (Garrow) asking that she come and drive him home. Garrow stated also that defendant told him she intended to testify that she had been drinking only at the hospital. Much of the case presented by the defense tracked this alleged conspiracy. On the other hand, the defense sought to impeach Garrow's credibility with evidence tending to show that he was no longer living with defendant, that his leaving had been the result of disagreements with her, and that Garrow had, since leaving her, harassed defendant and her young daughter with unwelcome and threatening phone calls.

Apparently defendant and Garrow reconciled their differences after the trial. Shortly thereafter Garrow approached defendant's counsel, informing him that his testimony at trial relating to a conspiracy was a fabrication, and that he had lied on the stand. Defendant's motion requesting a new trial was then filed, on the ground of newly discovered evidence based on the above information transmitted by Garrow.

At the hearing on the motion Garrow reiterated that he had lied about the defendant's conspiracy. After hearing Garrow's recantation testimony, the court denied the motion. Judgment was then entered on the guilty verdict.

The effect of recanted testimony by a witness for the prosecution in criminal cases is a matter of first impression with this Court. We must decide what standard should be used for granting a new trial when newly discovered evidence reveals that a government witness may have committed perjury at trial.

We find that, among the various jurisdictions which have addressed the problem, two tests or standards have emerged. The

first of these is commonly referred to as the "possibility standard." When this standard is applied, a new trial may be granted when, assuming the court is reasonably well satisfied that the recanted testimony of a material witness was, in fact, false, and the party seeking a new trial was taken by surprise when the false testimony was given, or did not know of its falsity until after the trial, then a new trial should be granted if the court finds that, without the testimony, the jury *might* have reached a different conclusion. *United States* v. *Wallace*, 528 F.2d 863, 866 (4th Cir. 1976).

We reject this standard. It has been criticized as requiring reversal in every case, if it is applied literally. *United States* v. *Stofsky*, 527 F.2d 237, 245-46 (2d Cir. 1975), *cert. denied*, 429 U.S. 819 (1976). In *Stofsky*, the court stated "once it is shown that a material witness has intentionally lied with respect to any matter, it is difficult to deny that the jury, had it known of the lie, 'might' have acquitted." *Id.* at 246. In other words, this standard would require a new trial on bare possibility alone. Another criticism of the possibility rule is that the courts which give lip service to it frequently circumvent the rule by loose application. As *Stofsky* pointed out, even those courts which profess to apply the possibility rule rarely reverse convictions based upon recanted testimony. *Id.* at 246 n.10. We think, too, that the possibility standard would have the deleterious effect of encouraging bribery or the bringing of other pressures to bear on witnesses to recant their trial testimony. The underlying and serious difficulty in all recantation cases, which the mere word of the witness will seldom resolve is: when is the witness in fact telling the truth?

The *Stofsky* court applied the "probability standard," which is the test commonly used in ruling on a motion for new trial based on newly discovered evidence. *Id.* at 246. This test requires that the new evidence must not have been previously discovered or discoverable by due diligence; must be material, not merely cumulative or impeaching; and would probably alter the jury's verdict. See *State* v. *Smith*, 145 Vt. 121, 131, 485 A.2d 124, 130-31 (1984); V.R.Cr.P. 33, Reporter's Notes; 8A J. Moore, Federal Practice § 33.03(1) (2d ed. 1982). We agree with the *Stofsky* court that the probability standard is the better of the two. See also *United States* v. *Krasny*, 607 F.2d 840, 844-45 (9th Cir. 1979). Nevertheless, we think the *framework* of the possibility standard which specifically addresses false testimony is more pre-

cise. Accordingly, we hold that the standard to be applied in this jurisdiction, which, in essence, contains elements of both the standards discussed above is as follows: a new trial will be required when: (1) the court is reasonably well satisfied that the testimony given by a material witness is false; (2) without that testimony the jury *probably* would have reached a different conclusion; and (3) the party seeking the new trial was taken by surprise when the false testimony was given or did not know of its falsity until after the trial. We think this test best balances fair trial protections with the dangers and unreliability of recanted testimony.

We remand the case with the following instructions. First, the court must determine whether, in its own view, Garrow's testimony at trial was true or false; second, if the court accepts the testimony as true, the verdict of the jury, and the subsequent judgment of guilty shall stand. However, if the trial judge is satisfied that the testimony was false, in accordance with the *initial* recantation, then the court shall conduct a new hearing on defendant's motion for a new trial at which the modified probability standard, discussed and adopted above, shall be applied.

We find this necessary because, as the State's brief points out and it is not questioned by defendant, Garrow subsequently pled nolo contendere to a charge of perjured testimony, not at the trial, but at the hearing on the motion for a new trial. In short, Garrow recanted his recantation, conceded that his initial recantation was perjury, and that his testimony at trial was truthful, after all.

## II.

Finally, defendant claims she was denied her constitutional right to a public trial when the judge ordered the courtroom doors locked during the actual proceedings. The doors were open for public access before commencement of proceedings and during recess periods. Defendant raised proper and timely objections to this procedure.

It is the general rule that all trials on the merits, both criminal and civil, should be conducted in public, that is, in open court. *State* v. *Mecier*, 145 Vt. 173, 185, 488 A.2d 737, 745 (1984); *Sunday* v. *Stratton Corp.*, 136 Vt. 293, 306, 390 A.2d 398, 405 (1978); V.R.Cr.P. 56(b). The United States Supreme Court has

held that the public has the right to attend criminal trials under the First and Fourteenth Amendments to the United States Constitution, *Richmond Newspapers, Inc.* v. *Virginia*, 448 U.S. 555, 580 (1980), but that the right is not absolute, *id.* at 581 n.18, and that the Sixth Amendment guarantees the accused the right to a public trial. *Gannett Co.* v. *DePasquale*, 443 U.S. 368, 382 (1979).

We agree with the State that a trial judge has, and must have, a considerable degree of discretionary latitude in the conduct of trials. Nevertheless, in view of the serious constitutional interests involved when a trial court closes its doors to the public, we will, on review, subject such a discretionary act to a microscopic scrutiny. Doing so in the instant case, we hold that the court's decision in the instant case is not justified by the record before us.

The judge stated that it was his general "policy" to order closure during actual trial proceedings, and gave two reasons for the policy: first, to prevent excluded witnesses from entering unsupervised; second, to eliminate unavoidable distraction of the jury. We have difficulty with this rationale enforced as a general policy since, by its very nature, it must be applied arbitrarily without reference to a particular case.

In reversing the state court in *Richmond Newspapers, Inc.*, *supra*, 448 U.S. at 580-81, the United States Supreme Court said:

> [T]he trial judge made no findings to support closure; no inquiry was made as to whether alternative solutions would have met the need [for closure] to ensure fairness . . . .

██ We encounter similar problems here. Accordingly, although we recognize and hold that closure lies within the sound discretion of the trial court if circumstances in a particular case require such action, we hold further that, particularly in a criminal case, where the constitutional right of the defendant to a public trial is so significant, closure, during the trial itself, should be undertaken, if ever, only in extremely rare instances. The necessity must be clear to the point that there are no reasonable alternatives available to satisfy the need, and should be continued only as long as closure continues to be reasonably necessary for the accomplishment of its original purpose. Finally, the court ordering closure should support its order with findings of fact placed on the record of each case; a policy applied arbitrarily to all trials generally is not sufficient.

In view of the above standards, we hold the trial court erred in ordering closure in the instant case. The court made no findings, persuasive or otherwise, to support its order; rather, it appears to have simply followed a general policy which it applies arbitrarily to all criminal trials.

Notwithstanding the error resulting from the closure, reversal is not automatic. The United States Supreme Court announced the doctrine of harmless error in *Chapman* v. *California*, 386 U.S. 18, 22 (1967), and clarified the doctrine in *United States* v. *Hasting*, 461 U.S. 499 (1983):

> [I]t is the *duty* of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, *including most constitutional violations*.

*United States* v. *Hasting, supra,* at 509 (emphasis added; citation omitted). We approved the doctrine in *State* v. *Nash, supra,* 144 Vt. at 434, 479 A.2d at 761, and apply it in this case. At the outset, we do not agree with defendant's contention that closure requires automatic reversal and the harmless error doctrine should not be applied in such cases. Granting that there are a limited number of constitutional violations that perhaps cannot be cured, even by the doctrine of harmless error (for example, denial of counsel is a violation of the Sixth Amendment which may well require an automatic reversal), we do not think that closure necessarily triggers such a result. Our examination of the record here satisfies us that no prejudice resulted to the defendant because of the error.

We note that the public was not totally excluded. The court was open to anyone wishing to attend the trial who enterd at any time up to the commencement of the proceedings and during all recesses. There is nothing to suggest that a significant number attended, or wished to attend and were unable to gain admittance. There is only one statement in the record indicating that someone who sought to enter was unable to do so: in arguing his objection to the closure, counsel for the defendant claimed that someone had tried the closed door. Similarly, there is nothing to suggest that representatives of the media sought and were denied access, or indeed, whether media representatives were or were not in attendance. Sequestration of witnesses, which appears to have been one of the court's objectives in closing the doors, is legitimate in itself, although how the court's action accomplished such

a goal is not clear. As far as the record shows, witnesses for both sides, like the general public, were free to enter at any time before the trial started, and during recess periods.

■ Reiterating that closure under the circumstances of the instant case was error, and error of constitutional dimensions, we hold, nevertheless, that on the record before us, defendant in the instant case was not prejudiced and the error was harmless.

*Remanded for further proceedings on the recantation issue in accordance with the instructions contained in this opinion.*